**07 CV 6616**

Judge Berman

349-07PJG/PLS

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

Peter J. Gutowski (PG 2200)
Pamela L. Schultz (PS 0335)

JUL 2 3 2007
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

PACSUM SHIPPING INC.,

                  Plaintiff,

      -against-

CHANGBAI SHIPPING CO. LTD. and
DAEYANG SHIPPING CO. LTD., SEOUL,

                  Defendants.

----------------------------------------------------------x

**07 Civ.**

**VERIFIED COMPLAINT**

      Plaintiff, PACSUM SHIPPING INC. (hereinafter "PACSUM") for its Verified

Complaint against Defendants CHANGBAI SHIPPING CO. LTD. (hereinafter "CHANGBAI")

and DAEYANG SHIPPING CO. LTD., SEOUL (hereinafter "DAEYANG"), alleges upon

information and belief as follows:

      1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party. This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C.

§1331. Federal jurisdiction also exists because the action arises under the New York Convention

on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 et seq. and/or

the Federal Arbitration Act, 9 U.S.C. §1 et seq.

2.    At all times material hereto, Plaintiff PACSUM was and still is a foreign business entity duly organized and existing under the laws of a foreign country with a correspondent address at 3701, 37F, China Merchants Tower, Shun Tak Centre, 168-200 Connaught Road, C. Hong Kong.

3.    At all times relevant hereto, Defendant CHANGBAI was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at Unit 1503, 15th floor, Far East Finance Centre, 16 Harcourt Road, Admiralty, Hong Kong.

4.    At all times relevant hereto, Defendant DAEYANG was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 14th floor, Kookje Bldg., 111 Da-Dong, Choong-Ku, Seoul, Korea.

5.    On or about October 11, 2004, Plaintiff PACSUM, in the capacity as Owner of the M/V PACIFIC EMERALD, entered into a maritime contract of charter party on an NYPE form with Defendant Changbai, as Charterer, for a period of 23 to 25 months 15 days more or less at Charterers' option. A copy of the charter party is annexed as Exhibit A.

6.    Under the terms and conditions of the charter party, all of the Defendant Changbai's obligations were guaranteed by Defendant Daeyang.

7.    Under the terms of the above referenced charter party, hire was earned, and there remains a balance due in favor of PACSUM in the amount of $516,696.85 under the terms of the charter party.

8.    The charter party provides for the application of English law and all disputes between the parties are to be resolved by arbitration in London, where arbitration has already been commenced and PACSUM specifically reserves its right to arbitrate the substantive matters at issue.

9.    This action is brought to obtain jurisdiction over Defendants and to obtain security in favor of Plaintiff PACSUM in respect to its claims against Defendants and in aid of London arbitration proceedings.

10.    This action is further brought to obtain security for any additional sums to cover Plaintiff's anticipated attorney fees and costs in the arbitration and interest, all of which are recoverable as part of Plaintiff's claim under English law.

11.    Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are recoverable as part of Plaintiff's claim.

12.    Plaintiff estimates, as nearly as can be computed, that the legal expenses and costs of prosecuting the London arbitration will be $200,000 and interest on its damages are estimated to be $101,075.29 (calculated at the rate of 6% for a period of 3 years, the estimated time for completion of the arbitration in London).

**Request for Rule B Relief**

13.    Upon information and belief, and after investigation, Defendants cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendants has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendants (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in either of the Defendants' names to wit:  Changbai Shipping Co. Ltd. and Daeyang Shipping Co. Ltd., Seoul, at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

14.    The total amount to be attached pursuant to the calculations set forth above is $817,772.14.

WHEREFORE, Plaintiff PACSUM SHIPPING INC. prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendants citing them to appear and answer the foregoing;

b.    That if Defendants cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendants up to and including **$817,772.14** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendants (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received, or transferred in either of the Defendants' names or as may be held, received or transferred for their benefit, at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.    That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to the recognition and enforcement of any judgment entered against the Defendants in the London proceedings; and

d.      For such other, further and different relief as this Court may deem just and proper

in the premises.

Dated: New York, New York
        July 23, 2007

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff PACSUM SHIPPING INC.

By: _____
        Peter J. Gutowski (PG 2200)
        Pamela L. Schultz (PS 0335)
        80 Pine Street
        New York, NY  10005
        (212) 425-1900

## ATTORNEY VERIFICATION

State of New York   )
                 ) ss.:
County of New York  )

PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

1.     I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.     The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.     The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Peter J. Gutowski

Sworn to before me this
23rd day of July 2007

_____
Notary Public

MANUEL A. MOLINA
Notary Public, State of New York
No. 02M06064999
Qualified In Kings County
Commission Expires Oct. 9, 20 09

# Time Charter

### GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party**, made and concluded in ..................................... 11th day of *October, 2004* ............. 19......

2  Between  PACSUM SHIPPING INC.

3  Owner of the good  *LIBERIA FLAG*, ............... Steamship/Motorship ..... *"PACIFIC EMERALD"* ......... of ..............

4  of ......tons gross register, and......................... tons net register, having engines of ......... indicated horse-power

5  and with hull, machinery and equipment in a thoroughly efficient state, and of about......................

6  of......................... cubic feet bale capacity, and about......................... of 2240 lbs.

7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,

8  allowing a minimum of fifty tons) on a draft of......................... feet......................... inches on......................... Summer freeboard, inclusive of permanent bunkers,

9  which are of the capacity of about......................... tons of fuel, and capable of steaming, fully laden, under good weather

10  conditions about ......................... knots on a consumption of about......................... tons of best Welsh coal—best grade fuel oil—best grade Diesel oil,

11  now ....*Description - see Clause 57.*..................................................................

12  ...... and *Changhai Shipping Co., Ltd.(Guaranteed by Daeyang Shipping Co., Ltd. Seoul)* .... Charterers of the City of *Seoul*

13  **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14  about  *23 months / 25 months about means plus/minus 15 days at Charterers' option*, world wide trading *via safe port(s), safe*

15  ......................... *berth(s), safe anchorage(s) always afloat, always acceptable, always within I, W.L.* within below mentioned trading limits,

16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17  the fulfillment of this Charter Party. *Acceptance of delivery of the vessel shall not constitute any waiver of Charterer's rights under*

18  *this Charter Party.*

19  Vessel to be placed at the disposal of the Charterers, at *direct continuation on completion of present voyage* .........................

20  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), at

21  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6). Vessel on her delivery to be

22  the Charterers may direct, if such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her delivery to be

23  ready to receive cargo with clean-swept holds and *Vessel to be light, staunch, strong and in every way fitted for the lawful ordinary cargo service*

24  *for the currency of this Time Charter* service, having water ballast, winches and

25  donkey-boiler with sufficient steam power, or if not equipped with donkey-boiler, then other power sufficient to run all the winches at one and the same

26  time  (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

27  dise, including petroleum or its products, in proper containers, excluding *Cargo exclusions - See Clause 35.* .........................

28  (vessel is not to be employed in the carrying of Live-Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

29  all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

30  America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

31  Mexico, and/or South America,......................... and/or Europe,

32  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

33  October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding, when out of season, White Sea, Black Sea and the Baltic.

34  *Trading exclusions - See Clause 34.* .........................

35  .........................

36  as the Charterers or their Agents shall direct, on the following conditions:

37  1.   That the Owners shall provide and pay for all provisions, *all drinking/fresh water, lubricating oil,* wages *including overtime,*
*immigration of vessel's crew* and consular shipping and discharging fees of the Crew; shall pay for the
insurance of the vessel, *unless otherwise stated* also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her

38  class and keep
the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

39  2.   That *while on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *customary and compulsory*
Pilotages, *canal, steersmen, boatage, lights, tug-assistance, dock and other dues and charges,* Agencies, Commissions,

40  Consular Charges (except those pertaining to the Crew *and/or flag of the vessel*), and all other usual expenses except those before stated, but when the vessel
puts into

41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44  of six months or more. Owners *to provide and keep onboard valid deratization or deratting exemption certificate throughout the*
*timecharter period.*

45  Charterers are to provide necessary dunnage and shifting boards, also any extra *cargo* fittings requisite for a special trade or unusual cargo, but

46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47  for dunnage, they making good any damage thereto.

48  3.   That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on

49  board the vessel at the current price in the respective ports, the vessel to be delivered with not less than......................... tons and not more than.........  *See Clause 3A*

50  .........................tons and to be re-delivered with not less than......................... tons and not more than......................... tons.

EXHIBIT

51  4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of  *USD 21,500 (United States dollars)* ~~per~~

52  *daily including overtime.*~~.................................. United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and~~

53  ~~stores, or~~ ~~.......................... Summer freeboard, per Calendar Month, commencing on and from the~~ *time*  day of her delivery, as aforesaid, and to

54  ~~and after the same rate for any part of a~~ *day* ~~month, hire to continue until the hour of the day of her re-delivery in like good order and condition,~~ *substantially*

55  *the same condition as on delivery,* ordinary

wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot one safe port in charterers' option within following*

56  *ranges any time day or night, Sundays and Holidays included:*

*passing Skaw/Passero range or Boston/Bahia Blanca range or Vancouver/Valparaiso range or Aden/Japan range including*

*Malaysia/Indonesia/Philippines if Red Sea then passing Aden eastbound if Persian Gulf then passing Muscat Outbound* unless

otherwise mutually agreed. Charterers are to give Owners not less than 25 days prior to re-delivery, charterers to declare re-delivery range,

*actual re-delivery notice 15/10 approximately + 7/5/2/1/ days definite*

57  notice of vessels expected date of re-delivery, and probable port. *- See Clause 53.*

58  5.  *Payment of said hire to be made in* ~~New York~~ *by charterers to owners' nominate bank* in cash in United States Currency, *15 days*

~~semi-monthly in advance, and for the last-half-month~~ *last 15 days* or

59  ~~part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becoming~~

60  ~~due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the~~

61  ~~hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-~~

62  ~~terers, without prejudice to any~~ *fundamental* ~~claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working-day~~

63  ~~following-that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64  ~~to have the privilege of using vessel at once, such time used to count as hire.~~  *See Clause 5A*

65  Cash for vessel's ordinary disbursements at any port may be advanced *with owners' prior approval* as required by the Captain,

66  by the Charterers or their Agents, subject

~~to 2 1/2%~~ commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67  of such advances.

~~58~~  6.  That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place that Charterers or their Agents may

69  direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~

70  ~~lie aground. See NAABSA Clause.~~

71  7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

74  ~~paying Owners~~ ~~.......................... per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75  ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~  *No passengers allowed.*

76  8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78  agency, and Charterers are to load, stow, and trim the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for

cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *- See Clause 39.*

79  9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

80  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

81  10.  That the Charterers shall have permission to appoint a Supercargo *at charterers' risk and costs*, who shall accompany the vessel and see that

82  voyages are prosecuted

with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

83  rate of *USD 18.00* ~~$1.00~~ per day, Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

84  Clerks, Stevedores Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. *- See Clause 67.*

85  11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

86  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

87  terers, their Agents or Supercargo, when required, with a true copy of daily Logs *in English*, showing the course of the vessel and distance run and the con-

88  sumption of fuel. *- See Clause 42.*

89  12.  That the Captain shall use diligence in caring for the ventilation of the cargo. *It is understood that the vessel is natural ventilations only.*

90  13.  ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ~~..................................~~

91

~~93~~  ~~on giving written notice thereof to the Owners or their Agents~~ ~~..................................~~ ~~days previous to the expiration of the first-named term, at any declared option~~

94  14.  ~~That if required by Charterers, time not to commence before~~ ~~..................................~~ ~~but not later than 4 p.m. Charterers if~~

95  ~~not have given written notice of readiness on or before~~ ~~..................................~~ ~~and should vessel~~

96  ~~their Agents to have the option of cancelling this Charter at any time not later than the day of vessels readiness.~~

97  15.  That in the event of the loss of time from *deficiency and/or default of crew or officer* ~~deficiency of men or stores,~~ fire, breakdown or

98  damage to hull, machinery or equipment,

grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause

99  *not excepted in this Charter party whatsoever, unless caused by charterers.*

preventing the full *use of the vessel to Charterers* ~~working of the vessel,~~ the payment of hire shall cease for the time thereby lost; and if upon the voyage

the speed be reduced by

100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra *bunkers* fuel consumed in consequence

101  thereof, and all *direct* extra expenses shall be deducted from the hire.

102  16.  That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106  purpose of saving life and property.

107     17. ~~See Clause 64.~~ ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New~~
~~York,~~
108 ~~one—to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~
109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~

110     18. That the Owners shall have a lien upon all cargoes, and all sub-freights, *hire and sub-hire* for any amounts due under this Charter,
111 including General Aver-
112 age contribution, and the Charterers to have a lien on the Ship for all moneys paid in advance and not earned, and any overpaid hire or excess
113 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
114 might have priority over the title and interest of the owners in the vessel.

    19. That all derelicts and salvage *and assistance to other vessels to be for Owners and Charterers equal benefit after deducting*
*the Master's and crew's proportion and all legal expenses and hire paid under Charter for the time lost in salvage also repairs*
*of damage and fuel consumed. The Charterers to be bound by all measures taken by Owners in order to secure payment of*
*salvage and to fix its amount* ~~shall be for Owners and Charterers equal benefit after deducting Owners and Charterers expenses and~~
115 ~~Crew's proportion.~~ General Average shall be adjusted, stated and settled *in London*, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule I of~~
116 York-Antwerp Rules *1974, as amended 1990 and/or any modifications thereof* ~~1924, at such port or place in the United States as may be selected~~
~~by the carrier, and as to matters not provided for by these~~
117 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118 ~~United States money at the rate prevailing on the dates made and allowances for damage in cargo claimed in foreign currency, shall be converted at~~
119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall if~~
122 ~~required, be made by the goods, shippers, consignees or owner of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account in the~~
124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds of credit balances, if any, shall be paid in~~
125 ~~United States money.~~
126 ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the~~
128 ~~goods, the shippers and the consignees, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~ *New Jason Clause as attached. Hire is not to contribute to General Average.*
132 ~~Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.~~
133     20. ~~Fuel used by the vessel while off hire,~~ also ~~for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the~~
134 ~~cost of replacing same, to be allowed by Owners.~~
135     21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138 ~~See Clause 43.~~

140     22. Owners shall maintain the gear of the ship as fixed, providing *gear* ~~(for all derricks)~~ capable of handling lifts *as per Clause 57,* ~~up to three tons,~~
also
141 providing ropes, falls, slings and blocks. ~~If vessel is fixed with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account~~ Owners also to provide on the vessel *electric light as on board* ~~for~~
~~lanterns and oil for~~
143 ~~night work, and vessel to give use of electric light when so fixed,~~ *as on board* but any additional lights over those on board to be at Charterers' expense. The
144 Charterers to have the use of any gear on board the vessel.
145     23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;
146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labour unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers.~~ In the event of breakdown of cargo gears or
winches by reason of disablement of insufficient power or otherwise, the hire to be reduced pro rata for the period of such as
insufficiency in proportion to the number of cargo gears or winches. If Charterers elect to continue work on hatch or
hatches affected by breakdown by hiring shore appliance after obtaining Owners prior consents which not to be unreasonable
withheld, Owners are to pay for shore appliance. But in such case Charterers are to pay full hire for all time shore
appliance are working. Any stevedores and/or labour charges additional direct accruing due to breakdown of vessel's
equipment including costs for standby of stevedora labour to be for Owners' account but up to next subsequent shift ~~of disabled~~
149 ~~winch or winches, or~~
150 ~~insufficient power to operate winches, Owners to pay for shore engine, or engineer, in lieu thereof, if required, and pay any loss of time occasioned~~
151 ~~thereby.~~
    24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder.~~
U. S. A. Clause Paramount *as per attached.*
155 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
156 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
157 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
158 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
159 *See New* Both-to-Blame Collision Clause
160 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
161

162 ~~Master, marines, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of or damage to, or any claim whatsoever of the owner of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier. .~~
167    25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging. – *See Clause 38.*
170    26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, *acts of pilots and tugboats*, insurance, crew, and all other matters, same as when trading for their own account.
172    27. A commission of *1.25* 2-1/2 per cent is payable by the Vessel and Owners to *Scott Line Corp.*
173 .........................................................................................................................................................................................................................................
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175    28. An address commission of 2 1/2 per cent payable to *Charterers*.................. on the hire earned and paid under this Charter.

*Clauses 3A, 5A, 15A, 29–113 all inclusive as attached hereto are to be considered an integral part of this Charter Party.*

*CHARTERERS:*                        *OWNERS:*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the
insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having
been made by the licensee or end user as appropriate and not by the author.

*M/V "PACIFIC EMERALD"/DAEYANG – TCP DD 11TH OCG., 2004*

## ADDITIONAL CLAUSES

3A.   With reference to Clause 3, it is agreed as follows:

*BOD as on board about 600MT IFO and about 37MT MDO, BOR about same quantity of BOD. Bunker price both ends USD 170/MT for IFO and USD 220/MT for MDO. Value of BOD to be paid together with 1st hire payment within 2 banking days after vessel's delivery. In south Africa, charterers are allowed to supply RMF 25.*

Charterers/Owners to have the option to bunker for their own account prior to delivery/redelivery, provided not interfering with vessel's operations.

### Bunker Quality Clause

1.   The Charterers shall supply bunkers of a quality suitable for burning in the vessel's engines and auxiliaries and which conform to the specification(s) mutually agreed under this charter.
Replenishment of bunkers is arranged and paid for by the charterers under the supervision of the Master/Chief Engineer.
Master to pay due diligence so that vessel does not cause oil spillage from vessel during bunkering. Master not to be responsible for actions/lack of diligence of bunkering barge or bunker supplier or any spillage caused by bunkering barge.

2.   During the currency of the charter the charterers shall ensure that bunker delivery notes are presented to the vessel on the delivery of fuel(s) and that during bunkering. The master and crew to take trip sample at the vessel manifold of all bunker supplied by charterers during the period of this C/P.
Such samples to be sealed and verified as true samples by both bunker suppliers' representative and ship's engineers.
The samples shall be delivered to the charterers at their request. Any claim by owners in relation to bunkers supplied by charterers shall be made as soon as possible but in any event within 60 days of the date of supply.

3.   The fuel samples shall be retained by the vessel for 90 (Ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any disputes as to whether the bunker fuels conform to the agreed specification(s) shall be settled by analysis of the sample(s) by a mutually agreed fuels analyst whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s).

4.   The owners reserve their right to make a claim against the charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries, the owners shall not be held responsible for any reduction in the vessel's speed performance and/or increased bunker consumption, nor for any time lost and any other consequences.

5.   *During the currency of this charter, charterers warrant to supply bunkers to vessel with specifications not lower than:*
*IFO: 380 CST RMG 35 standard as per ISO 8217 : 1996*
*MDO: DMB standard as per ISO 8217 : 1996*
*(A/A WOG)*

5A.   <u>Owners' banking channel:</u>

1

*MV 'PACIFIC EMERALD'/DAEYANG – TCP DD 11TH OCG., 2004*

Hires to be remitted less address commission by telegraphic tested payment to:

*Remit to : Bank of China, New York Branch (ABA 0326)*
*For account of : Bank of China (Hong Kong) Limited, Hong Kong (CHIPS UID 101779)*
*In favour of : Pacsum Shipping Inc.*
*(Business Address : 3701, 37/F., China Merchants Tower Shun Tak Centre, 168-200*
*Connaught Road, C., Hong Kong.)*
*A/C No. : 012-881-92-03341-8*

N.B. please instruct your bankers that all bank charges are for the account of the remitter payment to be received by beneficiary must be in full.

Evidence of receipt of such funds by the owners' bank shall constitute compliance of charterers' obligation to pay hire in accordance with clause 5, whether owners are so notified by the bank or not. Where there is any failure to make "punctual and regular payment" due to oversight, negligence or error or omission of charterers or their Agents, employees or otherwise for any reason where there is absence of intention to fail to make payment as set out, charterers shall be granted two banking days grace to rectify the failure. Where so rectified the payment shall stand as "punctual and regular payment".

Hire payment shall be considered punctual when it is received by owners' bankers on/before the due day.

First hire and the value of bunkers on delivery to be paid within 2 banking days after vessel's delivery. Charterers are entitled to deduct from last sufficient hire payments estimated owners' disbursements, but maximum USD 1,000 per port of *last voyage* as well as value of bunkers on redelivery. *Chrtrs to present owners with original invoice/vouchers of any disbursements for owners business within 60 days after the vessel's departure from calling ports for settlement.*

The charterers are to fully cooperate to make their agents shall attend owner's minor matter such as crew mail, supply of water, provision or laundry, shore passes, medical requirement for crew, master's cash advance, delivery of spare parts or minor voyage repairs, etc. Any additional agency fee and disbursements arising therefrom to be reimbursed by owners to charterers.

Owners agree that the hire due under this Charter Party shall not be assigned in any way whatsoever without the prior written consent of the charterers.

15A. With reference to clause 15 it is agreed as follows:

Referring to line 97, the lack onboard at any time of any necessary documentation attesting to the condition of all equipment and complying with regulations shall be deemed a deficiency with any loss of time occasioned thereby to be treated as off-hire and directly related extra expenses thereby incurred, if any, to be for Owners' account. Referring to lines 97 and 99, the time so lost for which hire shall cease (or be suspended) shall also include interalia:

  i.  from the time a vessel puts back to a port or deviates during a voyage (unless it is caused by those who travel onboard under charterers' auspices) or is withdrawn from the service of charterers for drydocking, repairs or other owners' purpose, until the vessel is again in the same equidistant position from the destination and voyage resumed therefrom.

  ii.  losses of time due to delay to the vessel or interference with charterers' use of the

2

vessel by strikes, boycotts or stoppages in any form on account of the vessel's flag, registry, ownership, manning or wages pattern or her previous trading.

29. Vessel to provide sufficient electric light as on board to permit night work at all hatches at the same time, free of expense to charterers.

30. Charterers have the option of holding a superficial inspection at their risk/expense/time during daytime while vessel is at port without interference with vessel's daily/normal operation, owners or Master to give every facility and assistance to carry out this inspection.

Any defective items if any affecting class or seaworthiness *excluding the items incurred by stevedore damage* should be immediately rectified at owners' time/expense/risk.

31. A joint on/off hire survey for the purpose of determining vessel's condition/equipment and bunker quantity on delivery and redelivery to be held at delivery port / at last discharging port prior to delivery and redelivery.
On-hire survey time occupied to be for owners' account but off-hire survey time occupied to be for charterers' account, cost to be equally shared between owners and charterers.

32. Vessel is a self-trimming bulk-carrier and is able to carry a full cargo of heavy grain. and/or its products in bulk in vessel's holds.

During the currency of Charter Party period vessel to have on board valid grain tables as per latest SOLAS Grain Loading Requirements.

Vessel is able to load a cargo of bulk grain and/or its products with one slack hold without any securing arrangements.

In certain conditions, two slack holds may be permitted subject to stability particulars for grain cargoes and satisfaction of grain/port authorities. Should two slack holds be required any securing/stowing and/or mechanical/manual loading/trimming, spout trimming required as determined by grain/port authorities to be arranged by charterers/their agents at charterers' time/risk/expense and to be done to the satisfaction of said authorities and master's satisfaction.

For the carriage of grain in bulk vessel to have on board at any time of this Charter Party period valid documents and certificates acceptable to a recognized classification society and all times accepted to National Grain Board.

33. <u>Holds Clean Clause</u>

Vessel's holds on delivery or arrival of 1st loading port to be clean/swept/washed down by fresh water and dried up so as to receive charterers' intended cargoes in all respects, free of salt *and free of rust scale* and previous cargo residue to the satisfaction of *hold* surveyor.

If vessel fails to pass any hold inspection, the vessel should be placed off-hire from *the time of rejection* until the vessel passes *cargo hold* re-inspection.
Any extra expenses/*time* directly *incurred thereby* to be for owners acct.

34. <u>Trading Exclusions</u>

The vessel shall be employed *for lawfully* worldwide trading *between* safe port(s), safe berth(s) and safe anchorage(s), *where she may safely lie*, always afloat, always accessible,

3

always within IWL, excluding any places *where being traded* to is prohibited by the country of the vessel's registry and/or the country of owners' incorporation, as well as any places trading to would restrict the vessel's qualifications to trade to the USA (including but not limited to Gypsy Moth regulations) or would subject the vessel to forfeiture, penalty or increased tonnage taxes under the laws of the USA. Such exclusion from trading limits now comprising Angola (including Cabinda), Algeria, Cambodia, Colombia, Oman, Cuba, Haiti, Iraq, Israel, Lebanon, Liberia, Libya *(including Gulf of Sidre/Sirte),* Congo (Democratic Republic of, formerly Zaire), Namibia, North Korea, Sierra Leone, Sri Lanka, Somalia, Sudan, Syria, Muldwarka of west coast of India, *Nigeria and all* Russian pacific *ports,* and/or any place which is classified as being high risk of Asian Gypsy Moth area, *and/or* the countries sanctioned by the United Nations, *U.S.A* and the E.U., *and/or warlike zones,* and/or all ice-bound areas as well as any place vessel shall either force ice or follow ice breaker.

No direct trading/sailing between *the countries/areas that is prohibited by political situation such as People's Republic of China* and Taiwan and vice versa.

<u>Breach IWL Clause</u>

Charterers have the option to break IWL subject to owners prior written approval which not to be unreasonably withheld, charterers paying extra insurance premium according to owners' underwriting tariff, which should not be more than the quotation in London insurance market.

<u>NAABSA Clause for grain and/or steel loading only:</u>

Worldwide trading always via safe port(s)/berth(s)/anchorage and vessel to always remain safely afloat, except if vessel calls at port(s)/berth(s)/anchorage in river plate, and/or river Parana (not above diamante), and/or south brazil only, but always excluding Amazon river, where it is customary for vessel of similar size to lie safely aground.

35. <u>Cargo Exclusions</u>

The vessel shall be employed only in lawful trades for the carriage of suitable lawful merchandise excluding aluminium ferrosilicon powder/briquettes, aluminium nitrate, aluminium silicon powder (uncoated), aluminium smelting/remelting by-products, ammonium nitrate, ammonium nitrate fertilizers, ammunition/arms and/or war materials/equipments, barium nitrate, calcined pyrites, calcium nitrate (the commercial grades of calcium nitrate fertilizers are permitted), castor beans, *cement in bulk,* charcoal, *concentrates,* copra and its products, direct reduced iron (DRI), explosives, ferrophosphorus, ferrosilicon, ferrous metal borings/shavings/turnings/cuttings (including iron/steel swarf), fishmeal/fishscrap, *green delayed petcoke,* hot briquette iron (HBI), Indian coal, Indonesian round logs and/or log raw materials for chips, iron oxide/sponge (spent), lead nitrate, lime (unslaked), livestock/animals and/or any kind of hides/bones, logs, magnesia (unslaked), magnesium nitrate, motor spirits, motor block and/or turnings, peat moss, *petcoke,* petroleum and/or its products, pitch prill/prilled coal tar/pencil pitch, potassium nitrate (saltpeter), radioactive/nuclear materials and/or its products/waste/contaminated objects, resin, rice in bulk, *salt, scraps,* seed cake, silicomanganese, *silica sand,* sodium nitrate/chile saltpetre/chilean natural nitrate, sodium nitrate and potassium nitrate mixture/chilean natural potassium nitrate, sulphur, tankage/garbage tankage/rough ammonia tankage/tankage fertilizer, zinc ashes/dross/residue/skimmings, and/or all other dangerous, hazardous, injurious, flammable or corrosive goods.

All cargoes carried under this charter are to comply with IMO's regulations/rules and the

4

*MV 'PACIFIC EMERALD'/DAEYANG – TCP DD 11TH OCG., 2004*

requirements or recommendations of the competent authorities of the country of the vessel's registry and of ports of shipment and discharge and of any intermediate countries or ports through whose waters the vessel must pass.

*Deck Cargo Clause:*

*Charterers have the option to carry cargo on deck at their own risk, responsibility and expense whatsoever and/or howsoever caused. The deck cargo shall be loaded and stowed within vessel's deck and hatch cover strength, and vessel's stability, be in accordance with IMO rules and/or local regulations, and be subject to master's prior approval. Furthermore, the stowing, lashing and securing of deck cargo shall be to the satisfaction of the master.*

*Charterers shall provide and pay for all lashing and stowing/securing materials and/or fittings required. If any stanchions/uprights were requested to use for cargo securing and lasing, the same shall be made of steel and all installation of stanchions/uprights to vessel's sockets on deck shall be under master's supervision and to master's satisfaction.*

*Bills of Lading covering deck cargo shall be claused: "Shipped on deck at charterers' shippers' and receivers' risk, expense and responsibility, without liability on the part of the vessel, or her owners for any loss, damage, expense or delay whatsoever and/or howsoever caused*

Special permitted for max two of each cargo of cement in bulk/concentrates/petcoke/ salt/steel scraps *per one year* subject to following protective clauses:

~~Cement Clause~~

1. ~~Charterers are responsible for and are to pay for thorough washing down of all holds by fresh water immediately after discharge to keep holds paint in good condition.~~
2. ~~Charterers indemnify owners of all possible cargo solidification due to hold sweating.~~
3. ~~The vessel already fitted with two cement holes on each hatch cover at 700 mm diam in each cargo hold. Any new cutting and welding for loading cement in bulk shall not be allowed.~~
4. ~~During discharging, charterers/receivers/stevedores shall do utmost to discharge all cargo and leave cargo residues as less as possible. Moreover, vessel's holds shall be left shovel clean up to the height that a man can reach.~~
5. ~~Such cargo not to be last-ego prior to redelivery, otherwise charterers to pay ILOHC USD 19,000 lumpsum.~~

Concentrates Clause:

Charterers have the option to load concentrate, however always excluding metal sulphide concentrates, provided following clause to apply:

1. Charterers hereby warrant that the cargo is non-corrosive and harmless subject to the IMO regulations and allowed by the cargo exclusion of governing charter party.
2. Concentrates cargo shall always be loaded, stowed, carried and discharged in accordance with appropriate local and national regulations, and in full compliance with IMO regulations.
3. Prior to commencement of concentrates loading, all cargo shall be analyzed by an independent surveyor with the time and cost on charterers account. The procedures of cargo test shall be in accordance with IMO regulations.
4. An appropriate certificate shall be furnished to master, indicating the pre-shipment moisture contents, flow moisture point, actual transportable moisture limit, stowage factor, and angle of repose, etc. (as defined by IMO) on shipment.

5

*M/V "PACIFIC EMERALD"/DAEYANG – TCP DD 11TH OCG., 2004*

5. Owners are allowed to appoint P & I surveyor or independent surveyor at charterers' time and expenses to carry out cargo sampling and to supervise loading, stowing, and executing of cargo separation, etc.
6. Prior to and during loading operation, all necessary cargo separation, if any, shall be properly erected up to surveyor and master's satisfaction at charterers' time and expenses.
7. After loading, cargo must be properly trimmed at charterers time and expenses to the surveyor and master's satisfaction.

Petcoke Loading Clause

1. Petroleum coke mentioned herein is only limited to the type of non hazardous, non dangerous green delayed type and/or calcined type and metallurgical type.
2. Such cargo to be loaded, stowed, trimmed, discharged strictly in accordance to latest IMO and/or any other latest regulations/rules applicable to such cargo.
3. Should any additional/special wash down of holds before loading be reasonably recommended proposed required by master, charterers undertake to arrange the same at their time/expense.
4. After discharge charterers to arrange at their expense/time of any additional/special wash down of holds carrying such cargo by chemical as master reasonably considers it necessary.
5. Any directly related extra expenses resulting therefrom/incurred thereby such as hold cleaning to masters satisfaction/hold survey etc. And any detention through any of the above causes to be for charterers' account.
6. Such cargo not to be last cargo prior to redelivery, otherwise charterers to pay ILOHC *USD 13,000* lumpsum.

Salt Clause

1. Charterers undertake to use holds as less as possible, provided vessel stability trim and stress permitting
2. Before loading, all holds assigned for salt to be lime washed by charterers at their time/expenses/risk to the satisfaction of master and independent surveyors appointed by charterers at their time/expenses.
3. Cargo to be loaded/stowed/trimmed/discharged strictly according to latest IMO and/or any other latest regulations/rules applicable to such cargo.
4. All fresh water used for irrigation on to rock salt during loading/voyage/discharge to be for charterers' account.
5. After discharge, charterers to supply sufficient fresh water at their expenses for shining down of all holds.
6. Any extra expenses resulting therefrom/incurred thereby (such as hold cleaning to master's satisfaction/hold survey etc) and any detention through any of above causes to be for charterers' account.
7. Charterers are allowed to use ships crew to perform lime washing and removal of same and repainting as necessary against paying *USD 10,000* lumpsum besides normal intermediate hold cleaning, but always subject to prior consent of master/crew and local regulations permit and all time so used to be for charterers' account. Owners/master are not to be responsible for passing hold inspection for loading next cargo and any consequences whatsoever caused due to such arrangement.
8. Such cargo not to be last cargo prior to redelivery.

Scrap Clause

Charterers may load non-oily steel scrap *cargoes* always excluding Motor Blocks and Tunings and agree to the following conditions:

6

*MV "PACIFIC EMERALD"/DAEYANG – TCP DD 11TH OCG., 2004*

1. Charterers undertake that the loading of first layer of scrap in each hold not to be released until touching tank top and not to be dumped and dropped during loading. Thereafter sufficient loads of scrap to be lowered as close as possible to the bottom of each hold, so as to provide a proper flooring and cushion to master's satisfaction, which shall not be unreasonably withheld.

2. Plates and structures, if any, always to be lowered into vessel's holds.

3. Charterers endeavor to arrange cushion mats on deck to provide safe protection of vessel from damage by loading/discharging scrap. Charterers and/or their servants to show due diligence when loading and discharging in order to prevent pieces of scrap from falling on vessel/vessel's deck.

4. Charterers will be responsible for any time loss and expenses incurred for any special preparation/cleaning/washing/repainting of holds if necessary.

5. Such cgo not to be last cgo prior to redelivery, otherwise charts to pay ILOHC USD 10,000 lumpsum.

36. Throughout the period of the Charter, vessel shall have on board current valid Panama and Suez Canal Tonnage Certificates and will so comply with all applicable requirements, regulations and recommendations so as to avoid delay in transit of these Canals.

Any delay due to non-compliance or any lack of proper documentation (or equipment) is to be treated as off-hire and any direct expenses incurred thereby to be for Owners' account.

Owners shall keep on board vessel all certificates necessary to comply with regulations of the ports of call, the following certificates at all times during Charter period and shall maintain their validity throughout the Charter period:

a. All Class Certificates

b. Deratisation or Deratting Exemption Certificate.

c. Panama and Suez Canal Tonnage Certificate.

d. All statutory Certificates, Tonnage Certificate.

e. Stability particulars for grain cargoes and hold filled with ends untrimmed addendum thereto.

f. FMC (Water Pollution) Certificate.

37. It is understood that vessel has full bunkering privileges at U.S. ports.

38. Excluded Ports and Ice Clause

The vessel not to be ordered to nor bound to enter not withstanding clause 34:

a. Any place where fever or epidemics are prevalent or to which the master, officers and crew by law are not bound to follow the vessel,

b. Any ice bound port or place or any port or place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the vessel's arrival or where there is risk that the vessel will not be able, on account of ice, to reach the port or place or to depart therefrom after completing loading or discharging. If on account of ice the Master considers it dangerous to remain at the loading or discharging port or place for fear of the vessel being frozen in and/or damaged, the Master shall have liberty to sail to a convenient open port or place and await the Charterers' fresh instructions.

The vessel shall not be obliged to force ice, nor to follow icebreakers. Any time lost through any of the foregoing causes or on account of the vessel being frozen in shall be for the Charterers' account.

7

*MV "PACIFIC EMERALD"/DAEYANG – TCP DD 11ᵗʰ OCG., 2004*

39.    Notwithstanding the provisions of clause 8, under owners standard authorization letter, master and owners to authorize charterers and/or their agents to sign bill(s) of lading for and on behalf of the master *in advance for every shipment*, if so required by charterers. Charterers hereby indemnify owners from all consequences arising from charters and/or their agents/servants to sign bill(s) of lading not in conformity with mate's receipts.

All bills of lading shall be without prejudice to this charter party and the charterers shall indemnify the owners against all consequences or liabilities which may arise from any inconsistency between this charter party and any bills of lading signed by the charterers or by their agents or by master at their request.

Charterers shall fax the copies of singed bills of lading to owners as soon as possible, but in any event not later than two working days prior to vessel's arrival of discharging port that such bills of lading covered.

40.    Intermediate Hold Cleaning Clause

If required by charterers, intermediate hold cleaning to be performed by vessel's crew provided that sufficient time is available and that the local labour and/or port regulations and weather conditions between previous final discharging port and subsequent loading port permits.

Although the master and crew are not responsible for the result of their hold cleaning and/or the acceptance of survey on hold condition (except at first loading port after delivery under this charter party), they shall do their best in cleaning cargo holds and other stained parts in order to make the vessel's cargo holds acceptable to surveyor / inspector for cargo loading.

Charterers to pay owners *USD 800* per hold used for the special permitted cargo of cement / concentrates / petcoke / steel scraps / salt or to pay *USD 600* per hold for normal and harmless cargo.

41.    Should the vessel be arrested during the currency of this Charter Party at the suit of any person having a legitimate claim against the vessel, hire under this Charter Party shall not be payable in respect of any period during which the vessel is not fully at Charterers' disposal and any directly related expenses shall be for Owners' account, unless such arrest is due to the default of Charterers or their Agents.

42.    Master is to forward promptly to Charterers completed log abstracts and port logs on the Owners' forms for both deck and engine for each passage.

43.    Drydock Clause

*No dry-docking during the charter period except emergency.*

44.    Liability for cargo claims as between Owners and Charterers shall be appointed in the manner as specified by the Inter Club New York Produce Exchange Agreement as amended May 1984.

Vessel is entered in the P and I Club namely:
"THE WEST OF ENGLAND SHIP OWNERS MUTUAL INSURANCE ASSOCIATION (LUXEMBOURG)"
*Chrtrs P and I Club: U.K. if applicable.*

*MV 'PACIFIC EMERALD'/DAEYANG – TCP DD 11TH OCG., 2004*

45. Deleted.

46. Stevedore Damage Claus

Any damage caused by stevedores during the currency of this charter party shall be reported by the master to the charterers or their agents, in writing, within 24 hours of the occurrence or as soon as possible thereafter but latest when the damage could have been discovered by the exercise of due diligence. The master shall use his best efforts to obtain written acknowledgement by responsible parties causing damage unless damage should have been made good in the meantime.

Stevedore damage affecting seaworthiness or the proper working of the vessel and/or her equipment, shall be repaired without delay to the vessel after each occurrence in the charterers' time and shall be paid for by the charterers. Other repairs shall be done at the same time, but if this is not possible, same shall be repaired whilst vessel is in dry-dock in the owners' time, provided this does not interfere with the owners' repair work, or by vessel's crew at the owners' convenience. All costs of such repairs shall be for the charterers' account. Any time spent in repairing stevedore damage shall be for the charterers' account. The charterers shall pay for stevedore damage whether or not stevedores have made the payment to the charterers.

47. Charterers to have the benefit of any return insurance premium receivable by Owners from their Underwriters, by reason of the vessel being in port for minimum 30 consecutive days, provided vessel is on-hire during such period.

48. Charterers to have the benefit of Owners' P and I club cover so far as Club rules permit.

49. Deleted.

50. Financial Responsibility in respect of Pollution

   1. Owners warrant that through the currency of this Charter they will provide the vessel with the following certificates:–

      a. Certificates issued pursuant to the Civil Liability convention 1969 (C.L.C.) (if applicable).

   2. Notwithstanding anything whether printed or typed herein to the contrary:

      a. Save as required for compliance with paragraph 1 hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.
      b. Save as required for compliance with paragraph 1 Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense arising which Owners may sustain by reason of the vessel's inability to perform as aforesaid.

   Vessel to have Certificate of Financial Responsibility under the U.S. Oil Pollution Act 1990 for calling U.S. ports throughout this time charter period.

51. Charterers have the option to redeliver the vessel with unclean holds paying lumpsum USD 4,500 in lieu of such cleaning including disposal/removal of dunnage/lashing materials/debris, if any, such amount to be paid to Owners on vessel's redelivery.

*M/V "PACIFIC EMERALD"/DAEYANG – TCP DD 11ᵀᴴ OCG., 2004*

52.  Should the vessel be on her voyage to the port of redelivery at the time when payment of hire is due, said payment shall be made for such length of time as Owners or their Agents and Charterers and their Agents may agree upon as the estimated time necessary to complete the voyage, taking into account bunkers to be taken over by the vessel for Owners' account before redelivery and when vessel is redelivered, any difference shall be refunded by Owners or paid by Charterers as the case may be.

Charterers are entitled to deduct values of estimated bunkers on redelivery from sufficient hire payments.

53.  Time of delivery/redelivery to be based on local time, for hire calculation time to be adjusted to GMT.

54.  General Clause Paramount, New Both-to-Blame Collision Clause, *General Average* and New Jason Clause as attached hereto are to be considered part of this Charter Party.

55.  Deleted.

56.  Wherever the word "fuel" appears in this Timecharter Party same is understood to mean "bunkers" unless otherwise specified.

57.  Vessel's full description

    1) NAME    : PACIFIC EMERALD
       EX NAME  : NIL
    2) BUILT    : 1996
    3) FLAG     : LIBERIA
    4) TYPE    : SINGLE DECK SELF TRIMMING BULK CARRIER

    5) DWT AND DRAFT IN:
       SUMMER SALT    : 49,016 MT DWT/11.730M
       WINTER SALT     : 47,714 MT DWT/11.486M
       TROPICAL SALT  : 50,321 MT DWT/11.974M

    6) TPC    : 53.40MT ON SUMMER DRAFT
    7) LOA    : 189.90M
    8) BEAM    : 32.20M

    9) CUBIC CAPACITY, GRAIN AND BALE/TOTAL AND EACH HOLD:

| | GRAIN (CBM) | BALE (CBM) |
|---|---|---|
| TTL: | 61,102 | 60,901 |
| NO.1 | 10,848 | 10,790 |
| NO.2 | 13,049 | 13,012 |
| NO.3 | 12,401 | 12,369 |
| NO.4 | 13,052 | 13,015 |
| NO.5 | 11,752 | 11,715 |

    10) NUMBER OF HOLD/HATCHES: 5H / 5H

    11) FLAT FLOOR TANK TOP DIMS(M):

| HOLD | LENGTH | BREADTH (FWD X AFT) |
|---|---|---|
| NO.1 | 28.79M | 6.55 X 22.45 |
| NO.2 | 27.40M | 22.98 X 22.98 |
| NO.3 | 27.40M | 22.98 X 22.98 |

*M/V 'PACIFIC EMERALD'/DAEYANG – TCP DD 11TH OCG., 2004*

| | | |
|---|---|---|
| NO.4 | 27.40M | 22.98 X 22.98 |
| NO.5 | 28.77M | 22.98 X 8.19 |

12) HATCH SIZE ( L X W):
    NO.1         17.43 X 16.00M
    NO.2 – NO.5   19.92 X 17.60M

13) TYPE OF HATCH COVERS:
    MACGREGOR ELECTRO HYDRAULIC FOLDING TYPE – DOUBLE SKIN

14) WATERLINE TO HATCH COAMING: (BSS 1100MT BUNKERS + 200MT FW)
    LIGHT CONDITION  : 18.18M (FORE)15.45M (AFT)
    LIGHT BALLAST    : 14.23M     12.66M
    HEAVY BALLAST  : 11.96M     10.88M

15) MAX OUTREACH OF CRANES FM SHIPS RAIL: ABT 11.90M

16) SPEED/CONSUMPTION (LADEN/BALLAST):
    AT SEA:
    LADEN: ABT 14.00KTS ON ABT 30.0 MT/IFO (380 CST)
    BALLAST: ABT 14.50KTS ON ABT 30.0 MT/IFO (380 CST)
    NO MDO AT SEA AND IN PORT EXCEPT BAD/COLD WEATHER AND/OR ENTERING
    INTO OR LEAVING FROM PORT OF CALL AND/OR NAMEUVERING IN NARROW/
    SHALLOW/CONGESTED WATER AND/OR BALLASTING/DEBALLASTING
    OPERATIONS.

17) CONSUMPTION IN PORT (24 HRS) IDLE AND WORKING:
    IN PORT: IDLE: ABT 2.5MT IFO (380CST); WORKING: ABT 3.5 MT IFO (380CST)

18) BUNKER TANK CAPACITY: IFO 1,988.2 CBM / MDO 134.1 CBM

19) FRESH WATER PRODUCTION (DAILY): 21.7 MT

20) FRESH WATER CAPACITY: 247.5 CBM

21) INTERNATIONAL GRT/NRT: 27,763 / 16,337MT
    PANAMA GRT/NRT: 27,763 / 23,068.88MT
    SUEZ GRT/NRT: 28,828.34 / 26,136.17MT

22) STRENGTH (MT/M2) ON TANK TOP:
    NO.1     24.50MT/M2,
    NO.2:    15.50MT/M2,
    NO.3:    27.30MT/M2,
    NO.4:    15.50MT/M2
    NO.5:    23.20MT/M2

23) STRENGTHENED FOR HEAVY CARGOES: YES / HOLD NO.2&4 MAY BE EMPTY

24) CO2 FITTED: YES IN CGO HOLDS

25) CALL SIGN: ELTJ2

26) TLX/FAX/TEL: 363639540 / 363639520 / 363639510 / SAT-C:463603450

27) CONSTANTS EXCL FRESHWATER: 350MT EXCL UNPUMPABLE BW

11

*M/V "PACIFIC EMERALD"/DAEYANG – TCP DD 11TH OCG., 2004*

28) CRANES : 4 X 35 T ELECTRO HYDRAULIC CRANES WITH 4 X 13.5 CBM PEINER HYDRAULIC SYSTEM GRABS

29) BALLAST : 28,485 CBM (INCLUDING NO. 3 HOLD 12,401 CBM)

30) LAST DRYDOCK : JULY 2004

31) DISTANCE FROM KEEL TO TOP MAST : 43.68 M

32) DISTANCE FROM KEEL TO TOP OF HATCH COAMING : 19.50 M

33) VENTILATION IN HOLDS : NATURAL

34) AWWF LADDER EQUIPPED : YES

35) P & I CLUB : WEST OF ENGLAND

36) HULL & MACHINERY INSURER : MITSUI SUMITOMO INSURANCE CO., LTD.

37) HULL & MACHINERY INSURED VALUE : USD20,000,000.00

58.   War Risk Clause

Conwartime 1993 to apply.

59.   Owners warrant that vessel complies with regulations pertaining to trading to or from the United States port existing at the date of this Charter Party. In the event of non-compliance therewith vessel to be off-hire for the time lost thereby.

60.   Owners guarantee vessel not to be rejected at any port of call during Charter period by reason of trading with Cuba nor Israel before and any time/expenses incurred thereby to be for Owners account.

Vessel is not blacklisted by Arab countries nor other countries within the trading limits as stipulated herein.

Owners guarantee that vessel has not been related to ex-Yugoslavia in vessel's flag/Ownership/crew/etc.

61.   Vessel to be in all respects suitable for discharge by grab of normal/suitable size and Charterers to have the privilege of using bulldozers of normal/suitable size and weight in vessel's holds, subject to Master's approval, which not to be unreasonably withheld.

62.   Charterers shall not be liable for loss of life or personal injury nor arrest or seizure or loss or damage to the vessel and/or other objects arising from perils insured against by Owners' policies of insurance, provided that above mentioned loss/injury/arrest/seizure/damage are not caused by charters and/or their servants/agents.

63.   Charterers endeavour to keep Owners closely informed of vessel's movements and probable employment, together with full styles of Charterers' Agents appointed at each port.

64.   Bimco Standard Law & Arbitration Clause 1998 English Law, London Arbitration

12

*M/V "PACIFIC EMERALD"/DAEYANG – TCP DO 11TH OCG., 2004*

This contract shall be governed by and construed in accordance with English Law and any dispute arising out of or in connection with this contract shall be referred to arbitration in London in accordance with the arbitration act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this clause.

The arbitrations shall be conducted in accordance with the London Maritime Arbitrators' Association (LMAA) terms current at the time when the arbitration proceedings are commenced.

The reference shall be three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitration shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agreed) the arbitration shall be conducted in accordance with the LMAA small claims procedure current at the time when the arbitration proceedings are commenced.

65. Vessel has liberty of using diesel oil while manoeuvring in and/or out of port, in shallow/narrow/busy waters, straits canals, rivers.

66. Deleted.

67. Charterers to pay Owners lumpsum *USD 1,250.00* per 30 days or pro-rata for cables/victualling/entertainments etc.

68. Watchmen for cargo to be for Charterers' account and gangway watchmen to be provided by Owners, but where compulsory to employ and pay gangway watchmen from shore, the expenses to be for Charterers' account.

All opening and closing of hatches at each port to be done by vessel's crew as required by Charterers, provided same is permitted by local port authorities/labour union, otherwise Charterers shall employ and pay for shore labour for opening/closing hatches.

69. *Deleted.*

70. Charterers shall have the option of laying up the vessel for all or any portion (exceeding 30 days) of the Charter period, in which case hire hereunder shall continue to be paid, but there shall be credited against such hire the whole amount which Owners shall save (or reasonably should have) during such period of lay-up through reduction in expenses, less any extra expenses to which Owners are put as a result of such layup.

71. Deleted.

13

*M/V "PACIFIC EMERALD"/DAEYANG – TCP DD 11TH OCG., 2004*

72. In case of smuggling by Master/vessel's crew, Owners to be responsible for any delay to vessel/expenses/fines/penalties resulting therefrom but Charterers to be responsible for the same if caused by smuggling by Charterers' servants/Agents.

73. Deleted.

74. Owners guarantee that the vessel is not blacklisted by trading countries *within trading limits* due to vessel's flag/ownership/operators/age and whatsoever.

    Owners guarantee that vessel is AHL/WWF/ITF fitted *or ITF equivalent* and are in order during the whole period of this Charter Party.

75. This Charter Party has been drawn up in two originals, one to be retained by Owners and the other by Charterers.

76. In the event of loss of time due to boycott of the vessel by shore labour or due to government restrictions or its recommendations all caused by reason of the terms and conditions on which the members of the crew are employed or by reason of any trading of this or any other vessel under same ownership, operation or control, or by the I.T.F. payment of hire shall cease for the time thereby lost and the Owners to reimburse the Charterers any expenses caused thereby.

77. Deleted.

78. Owners' option to bunker vessel for their account prior redelivery provided same does not interfere with Charterers' cargo operations.

79. Unique Bill of Lading Clause
    Charterers warrant that they or their Agents or all subsequent Charterers or their Agents are or will be registered for the use of Unique Bill of Lading issued under this Charter Party. For the cargoes bound to the U.S.A. according to the U.S. Customs Regulations (19 CFR 47A) and Charterers hereby indemnify Owners from all consequences whatsoever resulting from the failure to comply with the above custom regulations.

80. Deleted.

81. Owners guarantee that for the duration of this Charter the vessel will not in any way have Panamanian ownership as long as/or if a dispute between U.S.A. and Panama exists.

82. Deleted.

83. In case the original B(s)/L not arrive in the discharging port in time, then owners to release the entire cargo against charterers' LOI *for discharging cargo without presentation of the original B(s)/L which is all in order* in owners P and I club wording and format, signed by two authorized officers of charterers with *the company* stamp and names and titles of the signed officers. The LOI to be faxed to owners office latest two working days prior to vessel's arrival of d/port. The original LOI to be couriered to owners' office promptly.

84. Owners to be responsible for all costs arising form detention, seizure or forfeiture of the vessel in the event of any contravention of U.S.A. Anti-Drug Abuse Act of 1986 and vessel to be off-hire for any period during such detention, seizure of forfeiture unless caused by Charterers and/or Charterers' servants and/or Shippers in which case Charterers to be fully responsible for all consequences arising thereof.

*M/V 'PACIFIC EMERALD'/DAEYANG – TCP DD 11TH OCG., 2004*

85. <u>Ocean Route Clause</u>

The charterers may supply an independent weather routing company's advise to the master, during the voyages specified by the charterers. The master shall comply with the reporting procedure of the routing service. But it is understood that final routing is always at master's discretion *for safety navigation*. For the purpose of the charter party "good weather condition" are to be defined as weather conditions in wind speeds not exceeding beauport force 4. Evidence of weather condition to be taken from the vessel's deck logs and independent weather bureau's report. In the event of a consistent discrepancy between the deck logs and independent weather bureau's reports. The *weather bureau's analysis report* to be taken as ruling. *If charterers fail to supply weather routing company's advice through out the voyage, the vessel's deck logs to be taken as ruling.*

No deduction from hire to be made without charterers' producing written evidence of speed deficiency and any financial loss.

86. <u>USDA/NCB Clause</u>

Owners guarantee that vessel free from Asian gypsy moth and never called CIS Pacific ports for last two years otherwise owners to be responsible for any consequences caused therefrom.

Furthermore owners guarantee that vessel meets all national cargo bureau/united states department of agriculture plant protection and quarantine office regulations.

87. Bimco standard ISM Clause to apply.

88. Vessel is guaranteed suitable for grab discharge, and that vessel's hold are clear of any fittings/super structures such as cardeck, curtainplate, container fitting whatsoever.

89. Vessel is able to load a full cargo of ore using alternate holds only, holds 2/4 maybe left empty, subject to vessel's stability/shearing force permitted

90. Deleted.

91. <u>Double Banking Clause As Bimco Recommended</u>:

1. The charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size of description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering

2. The charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the owners such advance notice as they reasonably can of the details of any such operations.

3. Without prejudice to the generality of the charterers' rights under (a) and(b), it is expressly agreed that the master shall have the right to refuse to allow the vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

4. The owners shall be entitled to insure any deductible under the vessel's hull policy and the charterers shall reimburse the owners and additional premium(s) required by

*M/V 'PACIFIC EMERALD'/DAEYANG – TCP DD 11TH OCG., 2004*

the vessel's underwriters and/or the cost of insuring any deductible under the vessel's hull policy.

5. The charterers shall further indemnify the owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

92.  All additional costs/arrangements (including arranging fenders to put between vessels), time/responsibility arising from this double bank operation to be for Charters risk and account.
Number, type and positioning of fenders always to be to Master's satisfaction and Master may move vessel away or order the other vessel away at any time if he considers conditions unsuitable. Any additional premium payable on hull and machinery insurance for such operation to be for Charterers' account.
Charterers to indemnify Owners / vessel against all cargo claims and subsequent to such operations. Charterers to give Owners due notice of their intention to perform such operation advising approximate type and quantity of cargo involved, destination of cargo and location of operation.

93.  Plans

Owners are to provide Charterers with copies of the vessel's capacity plan, general arrangement plans, Hydrostatic curves, and deadweight scale, together with copies of the currently approved grain loading plan and trimming scales, when these documents are available form shipyard.

94.  Deleted (See Line 148 of Main Body)

95.  Vessel to comply with and be maintained in accordance with the requirements of the Commonwealth of Australia loading and unloading safety measure regulations. Vessel to be fitted and will be maintained with hold ladders and crane access ladders for Australian trading.

96.  Owners warrant that steelwork in vessel's holds during the Charter party period, will be maintained to a standard which is consistent with normal practice for carriage of, for instance, grain, Alumina, valuable mineral ores, wood pulp and paper products. Any special requirement for cargo holds for loading charterers' specify cargoes to be for charterers' account.

97.  Vessel to work night day, if required by Charterers, and all winches and/or cranes to be at Charterers' disposal during loading and discharging, overtime stipulated herein also to include the following services:

a. Clearing of cranes from stowage in preparation for loading and/or discharging, if the rule of the port or labour union permits.
b. Opening and closing of hatches in preparation for loading and/or discharging, if the rule of the port or labour union permits.
c. Supervision of loading and/or discharging.
d. Maintaining power while loading and/or discharging, and care of crane.
e. Shifting ship during loading and/or discharging, and shifting between berths.
f. Docking and undocking.
g. Bunkering.
h. Officers and crew to shape up the ship's hatches and gear as much as possible prior to arrival at loading and/or discharging port, docks and/or places so as to immediately commence loading and/or discharging operations if the rule of the port

16

*M/V "PACIFIC EMERALD"/DAEYANG – TCP DD 11TH OCG., 2004*

and labour union permits.

Under advice to Owners, bonus to crew for any extra work ordered by charterers other than above stated to be mutually agreed between charterer/Master directly.

98.    Bottom Cleaning Clause:

If the vessel is in a port for more than ~~30~~ 25 days or idle at a safe anchorage for more than 30 days, owners to appoint divers to check hull bottom and report with signature to charterers. If charterers need hull bottom cleaning at their discretion, charterers are to bear the cost of hull bottom cleaning, Owners shall endeavor to carry out bottom cleaning at next available port where such facilities are available. Vessel is to remain on-hire during the cleaning operation. However, when practical, the bottom cleaning should take place at the port where the ship has been laying for more than 30 days, but if it is not practical to do so and cleaning has to take place at another location, charterers have no right to lodge a speed or bunker claim against the owners during the period the vessel is in a fouled condition and en-route to the port identified where the hull-cleaning is to be undertaken.

99.    Vessel shall be entered and will remain entered during the full currency of this Charter with a recognized first class P and I Club and shall carry full P and I cover.

100.   Owners guarantee that vessel's hatch covers are to be watertight all throughout this charter period and if any hatch cover found detective, same to be rectified at owners' time and expenses to charterers' satisfaction. Charterers also have the right to carry out hose test on all hatches at any time during this charter.

101.   Charterers option to weld padeyes on deck/hold at charterers' time/expense and same to be removed prior to redelivery but charterers' option to redeliver vessel without removing padeyes paying USD 15.00 per padeye.

102.   Owners warrant that the vessel and her Owners, operators and managers will comply with all international maritime convention, local and flag regulations, governing the proper and safe navigation, operation and management of the vessel, including but not limited to conducting their activities in accordance with the international safety management code. Owners hereby agree that any loss, damage, liability, cost and expense arising from failure to maintain compliance with such conventions, regulations and code will be for owner's account and agree to hold harmless and indemnify Charterers accordingly. Owners agree that the vessel will be off hire during non-compliance.

103.   Deleted.

104.   Owners guarantee that vessel can load up to full deadweight capacity, less a reasonable allowance for stores, constants, lubes and unpumpables provided stowage factor, stress and trim permitting, of cargo permits and provided there are no restrictions at loading and discharging port.

105.   Deleted.

106.   Owners warrant that the vessel has on board the International Tonnage Certificate 1969 in full accordance with IMO Requirement and International Convention on Tonnage Measurement of Ships 1969.

107.   It is understood that if necessary, vessel will comply with any safety/health regulations

17

*M/V "PACIFIC EMERALD"/DAEYANG – TCP DD 11ᵀᴴ OCG., 2004*

and/or requirements in effect at port of loading and/or discharging a particular reference is the United States Department of Labour Safety and Health Regulation set forth in Part III of the Federal Register. Although other provisions of this charter make it the responsibility of the Owners, it is agreed that should the vessel not meet safety/health rules and regulations Owners will take immediate corrective measures and any stevedore standby time including off hire, will be for the Owners' account.

108.    Adding off-hire period

Should vessel be placed off-hire during the currency of his Charter party for any reason whatsoever, Charterers have the option of adding such off-hire time to the charter period.

109.    Off-hire

Provided no cargo has been loaded on board the vessel, should the vessel be placed off-hire for more than 30 consecutive days except for off-hire due to docking survey and repairs due to perils of sea, the Charterers have the right to cancel the balance period for this Charter by giving notice to the Owners without prejudice to any other right the Charterers may have under this Charter.

110.    Owners or Master to give expected delivery date on fixing 7/5/3/2/1 days prior to date of delivery and inform 12/10/7/5/3/ days and 48/24 hours ETA at first loading port to Charterers' Agents at loading port.

111.    Millennium Clause

For the avoidance of any doubt, the obligations which this Charter Party imposes on Owners as to the seaworthiness of the vessel shall be understood to include an obligation to ensure that the vessel is in all respects millennium compliant.

112.    *U.S. Security Clause*
*If the vessel calls in the united states, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures:*

*Notwithstanding anything else contained in this charter party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guard, launch services, tug escorts, port security fees or taxes and inspections, shall be for the charterers' account, unless such costs or expenses result solely from the owners' negligence.*

113.    *Pre-Loading survey Clause for Steel Cargo.*
*In the event of loading steels, pre-loading survey is to be carried out if required by owners P & I Club surveyor at charterers time. The expenses incurred to be equally shared 50/50 by charterers and owners. Master is at liberty to insert owners' P & I Club surveyor's remarks on mate's receipts.*

114.    *Himalaya Clause (As per WOE recommended)*
*Exemptions and immunities of all servants and agents of the carrier*

*It is hereby expressly agreed that no servant or agent of the carrier (including every independent contractor from time to time employed by the carrier) shall in any circumstances whatsoever be under any liability whatsoever to the shipper, consignee or owner of the goods or to any holder of this Bill of Lading for any loss, damage or delay*

18

*MV "PACIFIC EMERALD"/DAEYANG – TCP DD 11TH OCG., 2004*

*of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his part while acting in the course of or in connection with his employment and, but without prejudice to the generality of the foregoing provisions in this clause, every exemption, limitation, condition and liberty herein contained and every right, exemption from liability, defence and immunity of whatsoever nature applicable to the carrier or to which the carrier is entitled hereunder shall also be available and shall extend to protect every such servant or agent of the carrier acting as aforesaid and for the purpose of all the foregoing provisions of this clause the carrier is or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of all persons who are or might be his servants or agents from time to time (including independent contractors as aforesaid) and all such persons shall to this extent be or be deemed to be parties to the contract in or evidenced by this Bill of Lading.*

– E N D –